NOT FOR  PUBLICATION _____[35]___


UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
CHRISTINE SPAGNOLI,                      :      Civil Action No. 06-414 (FLW)
                                         :
            Plaintiff,                   :
                                         :
       v.                                :
                                         :
BROWN & BROWN METRO, INC., et al.  :
                                         :      **OPINION**
            Defendants.                  :
_____:


**WOLFSON, District Judge**

       Presently before the Court is a Motion for Summary Judgment by Defendants, Brown &

Brown Metro, Inc. ("Brown & Brown"), Joseph Roskey ("Roskey") and Jennifer Moser

("Moser").  In December 2005, Plaintiff, Christine Spagnoli ("Spagnoli"), filed a complaint

setting forth numerous causes of action related to the termination of her employment as a

customer service representative following a medical leave from her job with Brown & Brown.

Specifically, Plaintiff contends that Defendants: (1) engaged in unlawful gender/pregnancy

discrimination, handicap discrimination and perceived handicap discrimination in violation of

NJLAD; (2) unlawfully interfered with Plaintiff's rights pursuant to the Family Medical Leave

Act ("FMLA"); and (3) intentionally inflicted emotional distress upon Plaintiff.  The Court has

considered the moving, opposition and reply papers, and, for the reasons set forth below,

Defendants' motion is granted in part and denied in part.

1

I. **Background**

Defendant, Brown & Brown, is an insurance company that provides a range of insurance and reinsurance products and services.  Defendants' Fact Statement ("Defs' Fact St.") ¶ 2. Brown & Brown has offices throughout the country, including a branch office in Clark, New Jersey, that services commercial, professional liability, employee benefits, life and personal insurance policies and maintains a surety bond business.  Defs' Fact St. ¶ 3.  Individual Defendants, Jennifer Moser ("Moser") and Joseph Roskey ("Roskey") are employees of Brown & Brown; specifically, Moser is employed as a Producer and Manager of the Professional Lines Department, Defs' Fact St. ¶ 47,  and Roskey was employed as the Human Resource coordinator and Account Manager for Brown & Brown's Clark office.  Defs' Fact St. ¶72.

Beginning in May 1998, Plaintiff, Christine Spagnoli, was employed as a Customer Service Representative ("CSR") at the Clark, New Jersey office of Brown & Brown.  Plaintiff's Fact Statement ("Pl's Fact St.") ¶¶ 1&2; Defs' Fact St. ¶¶ 1,3 & 11.  Plaintiff was an at-will employee whose employment was subject to termination at any time.  Defs' Fact St. ¶ 7.  She voluntarily left her employment at Brown & Brown in July 1999 to attend school and was rehired in October 2000 for the same position. Pl's Fact St. ¶¶ 5 & 6.  As a CSR, Plaintiff was responsible for performing clerical and administrative duties relating to the servicing of professional liability policies. Pl's Fact St. ¶ 6.  Plaintiff was not the only CSR in her department; in August 2002, Judy Russer ("Russer"), was promoted to a CSR position in the Professional Lines Department.  Prior to August 2002, Russer was employed as an Administrative Assistant. Russer Dep. at 138.  In addition, throughout the relevant time period, Steve Kelly ("Kelly") was

also employed as a CSR in Plaintiff's department. Defs' Fact St. ¶ 50.

In August 2002, and in connection with her ongoing efforts to become pregnant, Plaintiff had surgery to remove a fibroid cyst.  Pl's Fact St. ¶ 10; Defs' Fact St. ¶ 13. As a result of the surgery, Plaintiff was absent from work between August 28, 2002 and September 15, 2002; thereafter, Plaintiff returned to work. Id. ¶ 10; Id. ¶13.

 In March 2004, Plaintiff required an additional surgical procedure to remove a fibroid cyst, again in connection with her efforts to conceive. Pl's Fact St. ¶ 14.  In light of the impending surgery, on March 10, 2004, Plaintiff applied for short term disability benefits and leave pursuant to the Family Medical Leave Act ("FMLA").  Id.  In her application, Plaintiff notified Brown & Brown that she expected to be out of the office between March 24 and May 10, 2004.  Affidavit of Gregory Schaer, Esq. ("Schaer Aff."), ex. 12. On April 20, 2004, while Plaintiff was recovering from her procedure, Brown & Brown approved Plaintiff's leave pursuant to the FMLA; Plaintiff received FMLA leave for the entire period of time she was out of the office until she returned to work on May 19, 2004.   Pl's Fact St. ¶ 15; Defs' Fact. St. ¶ 43.

In July 2004, Judy Russer transferred from her position as a CSR in the Professional Lines Department to a position as an Account Assistant in the Commercial Lines Department. Pl's Fact St. ¶ 18; Defs' Fact. St. ¶ 48. However, at the time of this transfer, no action was taken to eliminate Russer's position in the Professional Lines Department and her position was not eliminated on the office's organizational chart.  Pl's Fact St. ¶ 26.  Russer's transfer resulted in a redistribution of work in the Professional Lines Department between Plaintiff,  Kelly, and the Account Executive, Rhonda Berry ("Berry"), with each member receiving a slightly increased workload.  Defs' Fact St. ¶ 50.

In July 2004, Denise Wynn Mazaros was hired to serve as Manager of both the Commercial and Professional Liability Departments.  Pl's Fact St. ¶ 29.  In addition, on October 21, 2004, Brown & Brown offered Jessica Markel ("Markel") a position in the Commercial Lines and Surety/Bond Department.  Pl's Fact St. ¶31; Defs' Fact St. ¶ 55.  When Markel began working in November 2004, however, she spent the mornings performing clerical tasks such as filing and data entry for Berry in the Professional Lines Department, Defs' Fact St. ¶60, and afternoons assisting Diane Coscia, the Bonds Manager.  Id.

Thereafter, in a letter dated November 1, 2004, Kelly voluntarily resigned from his position as a CSR in the Professional Liability Department and indicated that his last day of employment would be November 12, 2004.  Pl's Fact St. ¶ 38; Schaer Aff., ex. 38.  After Kelly's resignation, Plaintiff was the only CSR remaining in the Professional Lines Department. Following Kelly's departure, there was never any action to eliminate his position, nor was it listed as being eliminated on an organizational chart. Knudsen Dep., 84:2-86:24.  In addition, on November 29, 2004, Jennifer Remy ("Remy") was hired to work as an Assistant for the Commercial Lines Department with the prospect of moving into a marketing or small commercial position. Defs' Fact St. ¶ 66.

In connection with Plaintiff's ongoing efforts to become pregnant, on November 29, 2004, Plaintiff underwent a voluntary outpatient insemination procedure.  Pl's Fact St.  ¶ 40.  At the time, Plaintiff did not anticipate that she would be out of the office for any substantial period of time for this procedure nor did she anticipate a need for a medical leave as a result of the procedure.  Spagnoli Dep., 191:4-7. However, the day after the procedure, Plaintiff began developing dehydration, dizziness and vomiting.  Pl's Fact St. ¶ 40.  Upon reporting these

4

symptoms to her physician, Plaintiff was directed to report to the Emergency Room where she was admitted and treated for complications resulting from the insemination procedure. Id. ¶ 41. Plaintiff was hospitalized for four days and released in early December. Defs' Fact St. ¶ 70.

However, on December 8, 2004, Plaintiff was admitted to the intensive care unit due to the development of a life-threatening pulmonary embolism. Pl's Fact St. ¶ 44. As a result of this hospitalization, Plaintiff's husband communicated frequently with Brown & Brown to update them on Plaintiff's condition. Id. ¶ 45. Thereafter, on December 14, 2004, Joseph Roskey, Brown & Brown's Human Resources coordinator, sent Plaintiff copies of FMLA paperwork. Pl's Fact St. ¶ 46; Defs' Fact St. ¶ 72. On December 20, 2004, Plaintiff completed and returned the FMLA paperwork concerning the leave that commenced on November 29, 2004. Schaer Aff., ex. 22. The paperwork submitted by Plaintiff's physician in support of the FMLA application indicated that she would not be available to return to work until January 17, 2005. Pl's Fact St. ¶ 47; Defs' Fact St. ¶ 75.

In late December 2004, Roskey communicated with Brown & Brown's corporate office to discuss Plaintiff's absences and the calculation of her FMLA leave. Schaer Cert., exs. 33 & 34. To facilitate these communications, Roskey sent at least two emails which approximated Plaintiff's FMLA for the rolling 12 month period. Roskey's calculations estimated that as of January 17, 2005, Plaintiff would have exceeded her allotted amount of FMLA time by approximately two weeks. Id., ex. 34. Indeed, in response to Roskey's email that tabulated Plaintiff's leave, Kari Lemke ("Lemke") sent an email dated December 30, 2004, to Kelly Hoffman ("Hoffman") and Roskey that stated "pls. confirm that the full 12 weeks she's been out have been for her own personal illness. Under NJ law we have to allow an add'l twleve weeks for

family member illness and would not be able to terminate." Schaer Cert., ex. 38. Moreover, the afore-mentioned email from Lemke contained, as an attachment, a red-lined draft letter that terminated Plaintiff for exceeding her time under FMLA; specifically, the letter stated, "[u]pon review of your file we note that. . .you have exhausted the full twelve weeks of job protected leave available under the FMLA. . .While we certainly would have considered holding your position open for an additional short period of time, we have unfortunately, just lost. . .our biggest bond account. This loss requires that we immediately reduce staff. . . Regrettably, your position has been eliminated and we do not have an alternate position, even in another area, available to offer you." Schaer Cert., ex. 38. Importantly, however, this letter was never sent to Plaintiff. Indeed, Plaintiff was never informed about the loss of an important account nor was she told that based on her anticipated return date, she would exceed her allotted FMLA time. Moreover, despite the email communications between Roskey, Lemke and Hoffman, Roskey testified that based on Plaintiff's anticipated return date of January 17, 2005, the additional two weeks of leave amounted to "a reasonable time period" and, that there had been no determination that the company would characterize Plaintiff's leave as anything other than FMLA leave. Roskey Dep., 34:1-35:22.

Subsequently, on January 11, 2005, Roskey spoke with Plaintiff to confirm that she would be returning to work on January 17, 2005. Schaer Aff. ex. 36. Thereafter, Roskey sent an email to request that Plaintiff be placed on the payroll beginning on January 17, 2005. Schaer Aff., ex. 36. Between January 11 and January 12, 2005, Roskey spoke with Rich Knudson ("Knudson"), the President of Brown & Brown Metro. At that time, Roskey contends that Knudson informed him, allegedly for the first time, that he wanted to terminate Plaintiff effective

January 17, 2005.  Schaer Cert., ex. 37.  Subsequently, on January 12, 2005, Roskey wrote an email to Lemke and Hoffman in Brown & Brown's corporate office to that effect.  Schaer Cert., ex. 37.  Specifically, Roskey's email provided, "Rich would like me to talk to you again about Christine.  She is expected to be returning on Monday, Jan 17th and he would like to terminate her. He has re-organized the department and now only needs 2 CSR instead of 3.  We had to move Judy Russer there because of her absence and Christine is not qualified to move into Commercial Lines as a CSR. I know we have talked about this before but this is something that is pushing."  Id.

Thereafter, in an email date January 14, 2005, Hoffman explains, "Rich really wants to terminate Christine. She was the one we discussed with Joe and Denise last week in Clark.  They are going to eliminate her position effective Monday when she returns from leave. (bad timing, I know) I stressed how important it was that they have their ducks in a row as far as why her position was chosen as well as making sure they do NOT hire someone for a minimum of 6 months. They will not be transferring the person in from the Washington, NJ branch." Schaer Cert., ex. 39 (emphasis added).

Subsequently, when Plaintiff arrived at the Clark office on January 17, 2005, she met with Moser and Roskey.  At that time Moser explained to Plaintiff that her position had been eliminated pursuant to a reorganization of the department and that she was being terminated from her employment with Brown & Brown.  Pl's Fact St.  ¶ 67; Defs' Fact St.  ¶ 93.

Thereafter, on December 2, 2005, Plaintiff filed a Complaint against Defendants in the Superior Court, Law Division, Monmouth County alleging various causes of action including claims under New Jersey Law Against Discrimination ("NJLAD") and FMLA. On January 26,

2006, Defendants removed this action to the United States District Court for New Jersey.

Following discovery, on February 9, 2007, Defendants filed the instant Motion for Summary

Judgment.


## II. SUMMARY JUDGMENT

Summary Judgment is appropriate where there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Chelates

Corp. v. Citrate, 477 U.S. 317, 323 (1986).  A genuine issue of material fact is one that will

permit a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  To show that a genuine issue of material fact exists, the

nonmoving party may not rest upon mere allegations, but must present actual evidence in support

thereof.  Id. at 249 (citing First Nat'l Bank of Arizona v. Cities Svc. Co., 391 U.S. 253, 290

(1968)).  In evaluating the evidence, the Court must view evidence and draw inferences "in the

light most favorable to the party opposing the motion."  Waldorf v. Shuta, 896 F.2d 723, 728 (3d

Cir. 1990) (quoting Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)). Even

if a record contains facts that might provide support for a non-movant's position, "the burden is

on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material

factual issues sufficient to defeat a motion for summary judgment." Morris v. Orman, No. 87-

5149, 1989 WL 17549, at *8 (E.D.Pa. Mar. 1, 1989) (citing Childers v. Joseph, 842 F.2d 689 (3d

Cir. 1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193, at *5 n.8 (E.D.

Pa. June 20, 2000).

8

**III. DISCUSSION**

1. New Jersey Law Against Discrimination ("NJLAD") Claims

        In her Complaint, Plaintiff sets forth three causes of action under the NJLAD, arising from the termination of her employment including: (i) a claim for gender/pregnancy discrimination; (ii) a claim for handicap discrimination; and (iii) a claim for perceived handicap discrimination. New Jersey Stat. Ann. § 10:5-12 (2007).  Discrimination claims under NJLAD are governed by the standard set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  To establish a prima facie claim of discrimination in employment, a plaintiff must establish: (1) that she is a member of a protected class; (2) that she was qualified for the position from which she was terminated; (3) that she was terminated despite being qualified; and (4) that she ultimately was replaced by a person outside the protected class.  Marzano v.  Computer Science Corp. Inc., 91 F.3d 497, 502 (3d Cir. 1996).  However, the Third Circuit has held "that the fourth prong of the prima facie case should be 'relaxed' when the employee's layoff occurred in the context of a reduction in force. . .Rather, 'it is sufficient to show that he was discharged, while the [employer] retained someone [outside the protected class].'" Id.(citations omitted). Moreover, the evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent--i.e., that discrimination could be a reason for the employer's action.  Indeed, numerous courts have held that this initial burden is not intended to be onerous. Id. at 508; Wright v. Nesor Alloy Corp., 2006 WL 2830969, at * 11 (D.N.J. 2006).

        If a plaintiff is able to establish a prima facie claim, the burden shifts to the employer to

present a legitimate, non-discriminatory reason for the termination.  If the defendant can present

such a reason, the burden shifts back to the plaintiff to prove that the defendant's alleged reason

was pretextual.  McDonough v. Cooksey, No. 05-00135, 2007 WL 1456202, *3 (D.N.J. 2007)

(citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (citing McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802 (1973); Tex. Dep't of Community Affairs v. Burdine, 450

U.S. 248, 252-53 (1981).


A. Pregnancy/Gender Discrimination

        Plaintiff initially claims that by terminating her employment, Defendants unlawfully

discriminated against her on the basis of her gender/pregnancy in violation of NJLAD[1].  N. J.

Stat. Ann.§ 10:5-1 et seq.  Defendants, on the other hand, argue that Plaintiff has not established

a prima facie case of gender discrimination.  The parties do not  dispute the first three prongs of

the prima facie analysis and, indeed, the record reflects that: (1) Plaintiff is a woman and was

undergoing fertility treatments; (2) Plaintiff was qualified for her position; and (3) Plaintiff was

qualified despite being terminated.  Instead, Defendants argue that Plaintiff cannot establish the

fourth prong of the prima facie analysis for discrimination, i.e. that Plaintiff was terminated and

people outside the class were retained.  Specifically, Defendants argue that because three female

---

        [1]Importantly, the Court notes that Plaintiff contends that she has not separately asserted a
claim for "gender discrimination" in this case. Indeed, Plaintiff suggests that the claim for
discrimination is "part and parcel of plaintiff's claim for pregnancy discrimination." Although
the Court understands these claims to be related, the Court does not understand how this Plaintiff
can set forth a claim for pregnancy discrimination when, in fact, she was not pregnant at the time
of the underlying events.  Instead, Plaintiff was undergoing a fertility treatment that led to the
life-threatening medical emergency that caused her to be out of work from November 2004
through January 17, 2005.

employees – Moser, Berry and Russer – were retained in the Professional Lines department following the company's alleged restructuring, Plaintiff cannot meet the prima facie claim for gender discrimination.  The Court agrees.

To begin, as discussed above, in considering the fourth prong of a prima facie claim for discrimination, the Third Circuit distinguishes between an analysis of employment discrimination that occurs in the context of a "straight layoff" and employment discrimination in the context of a reduction in workforce ("RIF").  See Marzano, 91 F.3d at 504 ("[T]he court did not analyze Ms. Marzano's allegations in the context of a "straight" layoff (as opposed to a layoff which takes place in a RIF context)").  In the context of an RIF claim, the Third Circuit has held that the fourth prong of the prima facie analysis should be relaxed and that a plaintiff may prevail in meeting her initial burden by establishing that she was discharged while the employer retained someone outside the protected class.  See Marzano, 91 F.3d at 502; Chu-Constable v. Broad U.S.A., Inc., 2006 WL 3359303 (N.J. Super. App. Div. Nov. 21, 2006).    Thus, in establishing a prima facie case of gender discrimination in a RIF context, a plaintiff need not show that she was ultimately replaced by a person outside the protected class.

In Perna v. Township of Montclair,  2006 WL 2806276 (D.N.J. Sept. 28, 2006), for example, the court considered whether a plaintiff whose position as a secretary was terminated for budgetary reasons and who was not offered another position within the township established a prima facie case of gender discrimination under NJLAD.  There, plaintiff alleged that when the town manager terminated her, he allegedly informed her that he intended to hire a more traditional secretary at a lower salary and did not offer the plaintiff this position despite her qualifications. In addition, plaintiff's complaint alleged that an unspecified male in a different

department was offered a different position with the township after his original position was terminated.  Despite these allegations, the court held that Perna had not satisfied the fourth prong of the prima facie analysis for gender discrimination. Indeed, the court noted that, "[p]laintiff's position was terminated and she does not allege that she was replaced by a male. Under these circumstances, Plaintiff must allege that the employee retained (i.e., the male who was allowed to maintain his employment with the Township after his original position was terminated) was similarly situated. The imposition of a requirement that Plaintiff allege that this unspecified male was similarly situated to her is necessary to protect against frivolous gender discrimination. . . besides Plaintiff's fleeting reference to gender discrimination in her complaint, the complaint reflects no other mention of gender discrimination. In fact, Plaintiff specifically alleges that at the time she was terminated, the Township hired a number of female employees." Id. at *6.  For those reasons, the Perna Court held that Plaintiff did not make out a prima facie case of gender discrimination.

In the instant matter, Defendants concede that Plaintiff was terminated as part of a reduction in force, thus Spagnoli needs only establish that while she was discharged, Defendants retained someone outside the protected class.  However, as in Perna, in this case, Plaintiff has not alleged that she was replaced by a male nor that people in an unprotected class, i.e. men, were retained.  Indeed, despite the Third Circuit's "relaxed" standard for employment discrimination cases arising in the context of a reduction in work force, the record before this Court reflects that all of the Professional Lines Department staff members who were retained following Brown & Brown's alleged business reorganization were, in fact, women. Moreover, the record is replete with evidence that the majority, if not all, of the new hires for the Clark office during the time of

12

the alleged reorganization were women.  Thus, Plaintiff fails to establish the fourth prong of the

prima facie case for gender discrimination[2].

      Furthermore, Plaintiff does not attempt to respond substantively to Defendant's

contention that she has not met her prima facie case other than to argue that "[t]he evidence of

record establishes that plaintiff has established a prima facie basis for both pregnancy/gender

discrimination and handicap/perceived handicap discrimination and that the remaining issue of

whether defendant's proffered reason for terminating plaintiff due to an alleged 'restructuring' is

an issue which falls squarely within the province of the jury."  Pl's Opp. Br. at 4.  Although

Plaintiff is correct that questions of fact regarding an employer's allegedly non-discriminatory

reason for termination might present a question of fact for the jury, in order to reach that

question, the Plaintiff herself must meet the initial burden of setting forth a prima facie case for

discrimination.  However, as discussed above, Plaintiff has not garnered any facts to show that

Brown & Brown terminated her while retaining someone outside the protected class. For these

reasons, on the record before this Court, Plaintiff is not able to establish a prima facie claim of

gender discrimination and the Court will grant Defendant's Motion for Summary Judgment on

Plaintiff's claims for gender/pregnancy discrimination.

---

     [2]In the instant matter, Defendants have conceded that Plaintiff's termination occurred in
the context of a reduction in force. See Defs' Br. at 4 ("Thus, to establish a prima facie case of
discrimination in a case involving a reduction in force such as that here..."). Because a Plaintiff's
burden in establishing a prima facie claim for discrimination in the context of a reduction in
workforce is lower than in the context of a straight layoff, see Marzano, 91 F.3d at 502, Plaintiff
will benefit from the Court's consideration under this lesser standard, thus the Court will not
discuss whether the termination could, in the alternative, be considered a straight layoff.
Moreover, despite Plaintiff's arguments that the reduction in workforce was not enacted in good
faith, since Plaintiff has not met her prima facie burden in establishing a claim for under NJLAD,
the Court need not reach this issue.

Moreover, to the extent that Plaintiff sets forth a cause of action for pregnancy discrimination, the Court notes that Plaintiff was not pregnant at the time of her termination, but was, instead, out of the office for ongoing fertility treatments.  Indeed, even if this Court were to consider Plaintiff's claim as a distinct claim for pregnancy discrimination, Plaintiff's Complaint does not distinguish her pregnancy claim from her gender discrimination claim nor has she briefed it as such.  Further, because Plaintiff has asserted a claim for handicap discrimination/perceived handicap discrimination, it is hard for this Court to envision that a claim for pregnancy discrimination would not be subsumed either under the NJLAD standards for gender discrimination or handicap discrimination.  Indeed, under New Jersey law, "discrimination against women by reason of pregnancy violates the [NJLAD]." Leahey v. Singer Sewing Co., 302 N.J.Super. 68, 81 (Law Div.1996); see also Rendine v. Pantzer, 276 N.J.Super. 398 (App.Div.1994).  Further, the cases that have sought to apply the NJLAD to claims of pregnancy discrimination apply the McDonnell Douglas burden shifting analysis. See e.g., Santosuosso v. NovaCare Rehabilitation, 462 F.Supp.2d 590, 599 (D.N.J. 2006); McConnell v. State Farm Mut. Ins. Co., 61 F.Supp.2d 356, 362 (applying the McDonnell Douglas burden shifting analysis and holding that "New Jersey courts have held that discrimination on the basis of pregnancy is sex discrimination in violation of NJLAD.").

For all these reasons, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's gender and pregnancy discrimination claims[3].

---

[3]Because the Court has concluded that Plaintiff has failed to establish a cause of action under the NJLAD for pregnancy/gender discrimination, there is no basis for individual liability against Roskey and Moser under NJLAD and the Court will dismiss these claims against them.

B. Handicap/ Perceived Handicap Discrimination

Plaintiff additionally contends that Defendants discriminated against her on the basis of her handicap/perceived handicap in violation of NJLAD when they terminated her employment following her pulmonary embolism. N. J. Stat. Ann. 10:5-5.  To establish a prima facie case of discriminatory discharge under the NJLAD, an employee must prove: (1) that she was handicapped; (2) that she was otherwise qualified to perform the essential functions of the job with or without the accommodation by the employer, and was performing at a level that met the employer's expectations; (3) that she nevertheless was fired; and (4) that the employer sought someone to perform the same work after she left. Dicino v. Aetna U.S. Healthcare, 2003 WL 21501818, at *12 (D.N.J. 2003); Cinelli v. U.S. Energy Partners, 77 F. Supp. 2d 566, 597 (1999).

Initially, the Court notes that Defendants focus largely on Plaintiff's claim for perceived handicap discrimination by arguing that Plaintiff cannot establish a prima facie case for perceived handicap discrimination and argue that Plaintiff cannot establish that Defendants perceived her to be handicapped. Plaintiff, on the other hand, contends, without any specific argument, that she can establish causes of action for handicap and perceived handicap discrimination based on the pulmonary embolism that arose following the insemination procedure.  Although Plaintiff has not set forth these claims with any specificity, the Court understands Plaintiff to be arguing: (1) she was disabled because of the pulmonary embolism; and (2) in the alternative, that Defendants regarded her as disabled and took adverse employment related action against her based on that perception. Pl's Opp. Br. at 7.

i. Handicap Discrimination

15

In order to establish a prima facie case of handicap discrimination under NJLAD, a Plaintiff must prove that she is handicapped within the statutory definition. New Jersey Stat. Ann. 10:5-5.  NJLAD defines disability as: "[P]hysical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically."  N.J. Stat. Ann. 10:5-5(emphasis added).   New Jersey Courts have long held that the statutory definition "clearly encompasses handicapped or disabled people who do not have a substantial or permanent impairment at the time of the alleged discrimination, as early on recognized by our Supreme Court in Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 446 A.2d 486 (1982)." Soules v. Mount Holiness Memorial Park, 354 N.J.Super. 569, 575 ( N. J. Super. App. Div. 2002).  However, when the existence of a handicap is not readily apparent, expert medical evidence is required.  Viscik v. Fowler Equipment Co, 173 N.J. 1, 16 (2002).

Initially, the Court notes that Plaintiff has not set forth any facts, law or medical evidence to establish that Plaintiff was handicapped pursuant to NJLAD.  According to the statutory definition, a disability must prevent the normal exercise of a bodily or mental function or be otherwise demonstrable; in this matter, despite the liberal standard for finding that a party was suffering from a disability, Plaintiff has not set forth any facts to show that after she recovered

16

from the pulmonary embolism, her condition was in any way demonstrable or that it prevented the normal exercise of bodily and mental functions. Indeed although there is little case law that specifically defines the factors a court is to  consider in determining what comprises a disability pursuant to NJLAD, in McCoy v. Port Liberte Condominium Association #1, 2003 WL 23330682 (D.N.J. 2003), the court held that a Plaintiff who suffered from sporadic pain potentially caused by ongoing cystitis did not make out a prima facie case of handicap discrimination because the record did "not show that any doctor has diagnosed McCoy's condition, or even affirmed that she has any persistent condition at all, as opposed to merely periodic abdominal pain caused from time to time by various unrelated ailments." Id. at *10. Moreover, the court noted that although the NJLAD definition of "handicapped" is broad and encompasses more than the definition of disability under the ADA, "[it] does not, however, encompass any and all medical conditions. Cystitis is another term for a bladder infection. It is not readily apparent that a bladder infection is a handicap and [plaintiff] has offered no evidence to support the assertion that it is."  Id.

In the instant matter, although a pulmonary embolism is clearly a more severe and serious medical condition than cystitis, the record does not establish that this condition caused any lingering or permanent effects.[4]  Indeed, at the time Plaintiff returned to Brown & Brown, Plaintiff's physicians had cleared her to return to her job full-time without any accommodation. Moreover, there is no evidence which indicates that Plaintiff's medical condition was anything but a condition of limited duration or that Plaintiff was limited by her medical condition in any

---

[4]The Court notes that at the time of her deposition, Plaintiff testified that she was still taking blood thinners.  Spagnoli Dep. 149.

manner following her complete recovery.  Indeed, the record in this matter establishes that Plaintiff suffered from an unfortunate and unanticipated, life-threatening emergency which required her to be out of work for approximately 6-7 weeks.  However, she has not provided any medical evidence which would support a finding that a pulmonary embolism is of such an enduring character that its effects make it a disability under NJLAD, and the Court has trouble understanding Plaintiff's medical situation as anything other than a temporary emergency situation that required her to miss approximately six weeks of work.  Thus, I find that Plaintiff cannot establish a prima facie case of handicap discrimination under NJLAD.


ii. Perceived Handicap Discrimination

In addition, Plaintiff argues that even if the Court finds that her condition does not amount to a handicap under NJLAD, Plaintiff was unlawfully terminated because she was perceived as handicapped. Defendant, on the other hand, contends that Plaintiff cannot establish a claim for perceived handicap discrimination because she has no evidence that anyone at Brown & Brown perceived her as handicapped.  The Court agrees.

New Jersey courts have long held that NJLAD protects individuals who are not disabled as defined by the statute but are perceived as being handicapped. Olson v. General Electric Astrospace, 966 F. Supp. 312, 316 (D.N.J. 1997).  To state a claim for perceived handicap discrimination, a plaintiff must allege facts demonstrating that he or she was perceived by defendant as being handicapped.  Lowe-Surge v. Hagedorn Gero-Psychiatric Hospital, 2006 WL 709602, at *3 (N.J. Super. App. Div. 2006).  For example, in Lowe-Surge, plaintiff plead a cause of action for perceived handicap discrimination; however, in a deposition, the plaintiff

testified that she was not aware that defendants had a biased perception of her.  Id.  Thus, the court held that Plaintiff had failed to establish a prima facie case of perceived handicap discrimination.  Id.

Unlike Lowe-Surge, however, in DeJoy v. Comcast, the court held that there were material issues of fact as to whether defendants engaged in perceived handicap discrimination against the plaintiff when they made an adverse employment decision.  968 F.Supp. 963, 987 (D.N.J. 1997).  Specifically, in DeJoy, the court found that the following factors precluded a grant of summary judgment: (1) fact issues as to whether the Business Development position was a fabrication only offered to Plaintiff to avoid a lawsuit; and (2) the timing of Defendant's decision to terminate plaintiff  – specifically, that six days before his aneurysm, Plaintiff was told that he would continue in his position, however, a month after the aneurysm, Plaintiff was informed that he would be replaced.  For these reasons, the court in DeJoy found that issues of material fact existed as to whether Defendants perceived plaintiff as suffering from a disability that precluded summary judgment.

In the instant matter, Plaintiff has not pointed to any specific facts which would establish that the Defendants perceived her as being handicapped. Instead, Plaintiff contends, without any citations to the record, that "the evidence clearly establishes a basis for liability under the theory of perceived handicap discrimination."  However, in the absence of any factual support, Plaintiff cannot meet a prima facie case for perceived handicap discrimination.  Indeed, the court is troubled by Plaintiff's continued refusal to elaborate a prima facie case under the burden shifting analysis.  Further, after sifting through the record, the only evidence that this Court could find to support Plaintiff's claim that she was subject to perceived handicap discrimination is Plaintiff's

belief that "maybe the Company was worried that my pulmonary embolism would [a]ffect my

job." Spagnoli Dep. 150:16-150:24. Moreover, as in <u>Lowe-Surge</u>, Plaintiff testified that she did

not think that anyone at Brown & Brown perceived her as being handicapped; Plaintiff provided

the following testimony at her deposition:

> Q: What facts do you have to support your claim that you were discriminated against for your handicap?
> A: Because the day I came back from being out on disability is the date that I was terminated, so I felt that they were related.
> Q: Did anybody ever tell you that your termination was related to your leave for pulmonary embolism?
> A: No.
> Q: Do you have any documents to support that allegation?
> A: No.
> Q: Any other reason you believe you were discriminated against for your handicap of pulmonary embolism?
> A: No.
> Q: Do you think you're handicap[ped] in any other manner?
> A: Not that I can think of right here.
> Q: Do you think anyone perceived you to be handicap in any other manner?
> A: Not to my knowledge.
> . . .
> Q: Did anyone at Brown & Brown ever tell you that they were worried that your pulmonary embolism would interfere with your ability to perform your job?
> A. No, nobody ever said that.

 Based on Plaintiff's testimony and the lack of any other evidence to support Plaintiff's

claim that Brown & Brown perceived her as handicapped, Plaintiff cannot establish a prima facie

case for perceived handicap discrimination under NJLAD. For these reasons, the Court will

grant Defendant's Motion for Summary Judgment on Plaintiff's claims for handicap

discrimination and perceived handicap discrimination[5].

---

[5]Because the Court further concludes that Plaintiff has failed to establish a cause of action under the NJLAD for handicap discrimination or perceived handicap discrimination, there is no basis for individual liability against Roskey and Moser for these claims and the Court will

2. Family Medical Leave Act ("FMLA") Claims

      The FMLA was enacted to "balance the demands of the workplace with the needs of families." 29 U.S.C. § 2601(b)(1); Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 141 (3d Cir.2004).  The FMLA provides that certain employees may take "reasonable leave for medical reasons," 29 U.S.C. § 2601(b)(1), (2), Conoshenti, 364 F.3d at 141, including any "serious health condition that makes the employee unable to perform the functions of [his or her] position," 29 U.S.C. § 2612(a)(1)(d); Chittister v. Dep't of Cmty. & Econ. Dev., 226 F.3d 223, 225 (3d Cir.2000).  Two causes of action may arise from a violation of the FMLA: an "interference" claim, alleging that the employer interfered with a FMLA right, and a "retaliation" claim, alleging that the employer took an adverse employment action against the employee in retaliation for taking FMLA leave. See Bearley v. Friendly, 322 F.Supp.2d 563, 570-71 (M.D.Pa.2004); Parker v. Hahnemann Univ. Hosp., 234 F.Supp.2d 478 (D.N.J.2002).

A. FMLA Interference/Entitlement Claim

      Under the FMLA, an employee is entitled to be reinstated to her former, or an equivalent, position upon returning from leave. 29 U.S.C. § 2614(a)(1); Conoshenti, 364 F.3d at 141. However, the right to reinstatement is qualified; it does not entitle an employee to a right, benefit, or position to which the employee would not "have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B); Conoshenti, 364 F.3d at 141.  Hence, if the adverse employment decision occurs "for a reason unrelated to the leave[,] there is no right to

dismiss these claims against them.

reinstatement." Id. at 141.  Thus, to succeed on a FMLA-interference claim, a plaintiff must demonstrate that he or she was entitled to and denied some benefit under the FMLA.  See Bearley, 322 F.Supp.2d at 570-71.  The burden then shifts to the employer to show that the plaintiff would not have been entitled to that benefit even if the leave had not been taken.  See id. Indeed, the Defendant must show: (1) that the position plaintiff held before leave would have been eliminated even if she had never taken FMLA leave; and (2) that it offered plaintiff reinstatement in an equivalent position that she chose not to accept.  Parker, 234 F. Supp. 2d at 489.  Thus, in the instant matter, the Court must first determine whether Plaintiff was denied some benefit to which she was entitled under the FMLA.

Initially, Defendant argues that Plaintiff exhausted her FMLA leave on December 27, 2004, more than two weeks before she returned, and, therefore that Plaintiff was not entitled to reinstatement.  Plaintiff, on the other hand, contends that Defendant never notified Plaintiff that her that her March - May 2004 leave and her November - January 2005 leave would be considered FMLA leave and that she therefore did not exceed her FMLA leave.  Moreover, Plaintiff contends that she was never notified that she was approaching the end of her entitled period of FMLA leave and that she was given "every reason to believe that her absence was deemed to be covered under the FMLA."  Pl's Opp. Br. at 17. Based on evidence in the record, the Court finds that there are issues of fact as to whether Plaintiff was given reason to believe that her absence was deemed covered under FMLA which preclude summary judgment on Plaintiff's FMLA interference claim.

To begin, Plaintiff cites to 29 § C.F.R. 825.208 to support her claim that an employer must notify the employee within two business days that leave is designated as FMLA leave.

However, the U.S. Supreme Court has significantly constrained, if not completely invalidated, the application of these regulations. Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 88 (2002). In Ragsdale, the Supreme Court held that an employer's technical failure to designate leave as FMLA leave did not prejudice an employee who, because of medical restrictions, would have had to take the medical leave whether she qualified under the FMLA or not. Indeed, following the Supreme Court's decision in Ragsdale, the Third Circuit held that an employer's failure to advise an employee that her leave was being designated as FMLA leave is actionable only if the employee could show resulting prejudice. Conoshenti v. PSE&G, 364 F.3d 135 (3d Cir. 2004).

In light of this precedent, the Court notes that on April 20, 2004, Defendants informed Plaintiff that her leave from March 24, 2004 through May 10, 2004 would be considered  FMLA leave.  Schaer Cert., ex. 12.  In addition, on December 14, 2004, Defendants sent Plaintiff FMLA paperwork for her leave between November 29, 2004 and January 17, 2005.  Thus, it appears that Defendants gave Plaintiff some notice that her leave would be considered FMLA leave. Moreover, because Plaintiff's leave arose as a result of an emergency situation, Plaintiff cannot reasonably argue that she would have postponed the procedure if she had known that she would run out of FMLA leave; indeed, the record is clear that on November 29, 2004, Plaintiff was out of the office for a routine procedure and that, at some subsequent and unforeseen point, her condition became emergent and life-threatening.  Thus, even if Plaintiff had known on November 29, 2004 that she only had four weeks left of FMLA leave, she would likely not have put off the one day outpatient procedure.  In addition, Plaintiff contends that Defendants failed to properly notify her regarding her March -May 2004 leave.  However, this period of leave marks the first

FMLA leave for the rolling 12 month period; thus, Plaintiff would be hard pressed to show prejudice arising from the leave because she could not have anticipated that she would need a second period of leave.

However, in addition to arguing that she was given delinquent notice regarding her FMLA leave, Plaintiff contends that even if she had exceeded her FMLA leave, she was never notified that she had exceeded her leave and was, instead, given every reason to believe that the leave would be counted as allowable FMLA leave.  Thus, Plaintiff argues that this lack of notice amounted to prejudice.  Recent case law supports Plaintiff's position regarding the issue of notice. In Sjoblom v. Jersey Shore Medical Center, 2006 WL 1228709 (D.N.J. 2006), Judge Chesler dismissed a plaintiff's FMLA claim because the employer had provided plaintiff with actual notice of how it calculated the 12 month period for purposes of FMLA eligibility as well as the actual date upon which his FMLA would expire.  Because the plaintiff still exceeded his leave, Judge Chesler concluded that "[a]fter this point, JSMC was under no obligation under the FMLA to hold [Plaintiff's] position open for him." Id. at *4.

In Reid-Falcone v. Luzerne County Community College, 2005 WL 1527792 (M.D. Pa. 2005), plaintiff filed a claim under the FMLA alleging that her employer failed to restore her to an equivalent position following her maternity leave.  There, defendant argued that because Plaintiff did not return from FMLA leave within a 12 week time period, she was not entitled to be reinstated in her position.  In response, however, plaintiff alleged that she had not been informed that she would forfeit her right of reinstatement if her leave exceeded the FMLA.  As a result, the court denied the defendant's motion for summary judgment; specifically, because the plaintiff filed a sworn declaration asserting that she would have returned to work earlier to

24

protect her reinstatement rights the court held that summary judgment was not warranted.

Here, as discussed above, Plaintiff's leave was caused by a medical emergency that arose following a routine outpatient procedure. Because the underlying procedure was expected to last one day, it is unlikely that Plaintiff would have postponed the procedure even if she had known that she had only four weeks left of FMLA leave; indeed, neither Plaintiff nor anyone else could have anticipated that she would suffer from a pulmonary embolism requiring almost six weeks leave. However, despite the initial inability to know that Plaintiff would require FMLA leave, at some point, Defendants became aware that Plaintiff required FMLA leave. Moreover, and more importantly, at some point Defendants also became aware that based on the recommendation of Plaintiff's physicians, Plaintiff would also exceed the requisite FMLA period. Indeed, unlike Sjoblom where the court granted Summary Judgment to an employer who had provided actual notice of the date on which employee's leave would end, in the instant matter, neither Plaintiff nor Defendant contend that Plaintiff knew the actual date her leave would expire. Further, the evidence in the record demonstrates that although Defendants clearly knew when Plaintiff's FMLA leave would expire, they did not inform Plaintiff of these dates despite their ongoing communication with her. For example, an email from Roskey to Hoffman on December 23, 2004 details the dates of Plaintiff's FMLA leave and notes that with her anticipated return date, Plaintiff would have taken a total of 14 weeks and 2 days leave; thus, this email makes plain that Defendants knew that Plaintiff's FMLA leave would expire prior to her return. Schaer Cert., ex. 33. A similar email was sent from Roskey to Lemke, Hoffman and Rhoads on December 30, 2004; this email provides the dates that Plaintiff had been out of the office and indicates that Plaintiff will exceed her FMLA leave by approximately two weeks. Id., ex. 34. Moreover, the

red-lined draft termination letter dated December 30, 2004, suggests that Plaintiff would be

terminated because she exceeded her FMLA leave.  However, Plaintiff herself was never notified

that she exceeded FMLA; furthermore, when Plaintiff was eventually terminated, she was told

that the termination was a result of a department reorganization with no mention whatsoever that

Plaintiff had exceeded her allotted FMLA time.

Moreover, during her absence, Defendants represented to Plaintiff that the length of her

anticipated recuperation was reasonable and that it would have no impact on her job. For

example, when Roskey spoke with Plaintiff on January 11 to determine if she would be returning

to work, he did not mention at that time, or at any other relevant time, that she had exceeded her

leave under the FMLA. Indeed, Roskey had contacted Plaintiff to see if she would be returning to

work on January 17 as advised by her physicians.  Furthermore, at his deposition, Roskey

testified that he had the following conversation with Hoffman regarding Spagnoli:

> Q: So you had two conversations with Kelly prior to this conversation that you had with Christine in the beginning of January?
> A: Correct.
> Q: And what was the nature of the communications you had with Kelly...
> A: Just to see how I should proceed, if anything, with her approaching, you know, the 12 weeks or going past the 12 week FMLA leave.
> Q: At that point in time, had you made a determination as to when it was the Christine would be approaching or going past the FMLA time?
> A: Yes.
> . . .
> Q: But whatever date it was, explain to me what occurred during the conversation with Kelly.  What did you say to her and what did she say to you?
> A: Just that Christine was approaching the 12-week or exhausting her FMLA; and what our procedure should be or would be? And she said, do I have a return date? And then I said, yes, according to the State disability paperwork, we have a date of, again, I believe it's 1-17-05, and she said that was a reasonable time period and I needed to do nothing more.
> Q: She said that was a reasonable time period?
> A: Yes.

. . .
Q: Well was there any determination made to characterize her leave as something other than FMLA leave at that point?
A: No.

Schaer Cert., ex. 61, Roskey Dep. 33:22-35:22 (emphasis added).

For all these reasons, the Court finds that there are issues of material fact surrounding whether Plaintiff did, in fact, exceed her FMLA leave or if she was somehow granted an extended period of protected leave by her employer.

Moreover, in addition to fact issues regarding the type of leave that Plaintiff took, questions of fact remain on the reinstatement part of the claim.  Specifically, Defendants argue that even if Plaintiff could establish that her leave was FMLA protected, Plaintiff had no right to reinstatement because her job was terminated pursuant to a department reorganization.  Indeed, it is well-established that "the right to reinstatement is not absolute. An employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave." Pharakhone v. Nissan N. Am., 324 F.3d 405, 407 (6th Cir. 2003); 29 U.S.C. § 2614 (a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee to any right, benefit, or position to which the employee would have been entitled had the employee not taken leave.").  However, there are significant inconsistencies within the record that raise questions about Defendants' proffered reasons for Plaintiff's termination.  To begin, the record reflects that although Defendants' proffered reason for Plaintiff's termination was a departmental reorganization, Defendants had drafted an initial letter to Plaintiff that explained that she was being terminated because she exceeded her FMLA leave.  Moreover, despite the alleged reorganization of the department, Plaintiff was the only employee terminated and Plaintiff had no advance notice that

the department was being reorganized.  Indeed, a week before Plaintiff was to return to work, the HR department called Plaintiff to find out if she would be returning so she could be placed on the payroll. Moreover, there is no documentation about the purported reorganization and  no criteria for the implementation of reorganization.  Further, the decision to terminate Plaintiff was seemingly made at the same time that Plaintiff told the company she would be returning to work within a week and the decision to terminate Plaintiff's position was made by reference to Spagnoli herself and not her position.  In addition, there was no consideration of alternatives to terminating Plaintiff and the red-lined draft letter to Plaintiff references numerous other reasons for her termination unrelated to any reorganization.  Finally, there is the "smoking gun" email from Kelly Hoffman to Kari Lemke that provides: "Rich really wants to terminate Christine[6]. . . I stressed how important it was that they have their ducks in a row as far as why her position was chosen as well as making sure they do NOT hire someone for a minimum of 6 months[7].  They will not be transferring the person in from the Washington, NJ branch[8]."

For all these reasons, the Court finds that there are issues of material fact regarding whether Plaintiff's absence was deemed FMLA leave and whether Plaintiff was entitled to reinstatement or if there was a legitimate reorganization of the department.  Thus, this Court will deny Defendant's Motion for Summary Judgment on Plaintiff's FMLA interference claim.

---

[6]The court notes, that the email refers to Plaintiff specifically, not her position.

[7]Again, the Court notes that this underscores the inference that the position was not, in fact, eliminated and that they fired her for reasons unrelated to an alleged "reorganization."

[8] See fn 7.

ii. FMLA Retaliation

The FMLA prohibits an adverse employment action taken in retaliation for an employee's use of FMLA leave. See Victorelli v. Shadyside Hosp., 128 F.3d 184, 190 (3d Cir.1997). To assert a retaliation claim a plaintiff must demonstrate that: (1) he or she took FMLA leave, (2) he or she suffered an adverse employment action, and (3) the adverse action was causally related to the leave. Conoshenti, 364 F.3d at 146. When a plaintiff presents "direct evidence" that her FMLA leave was a substantial factor in the adverse employment action, the burden shifts to the employer to demonstrate that the action would have taken place even if the FMLA leave was not considered in the decision-making process. Id. at 147.  "Direct evidence" is evidence that would suffice to allow a jury to find that the employer placed "substantial negative reliance" on the taking of FMLA leave in deciding to impose the adverse employment action. Id. at 147 n. 10. Absent direct evidence, timing can be used to infer a causal connection between the leave and the adverse action, although it requires consideration "with a careful eye to the specific facts and circumstances encountered."  See Parker, 234 F.Supp. at 492 n. 15 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279- 80 (3d Cir.2000)). If the timing is not "unduly suggestive," causation may still be inferred from circumstantial evidence of ongoing antagonism or inconsistent reasons for the action. See id.

When the burden is shifted, an employer must demonstrate that it would have taken the same action for nondiscriminatory reasons. However, the employer need not isolate the sole cause for its decision. Conshoshenti, 364 F.3d at 147.  Thereafter, the plaintiff can demonstrate that the employer's proffered reason is pretextual and rebut it by either (1) discrediting the reason circumstantially or directly, or (2) adducing evidence that discrimination was more likely than

not a motivating or determinative cause of the action. See Parker, 234 F.Supp.2d at 487.

In the instant matter, Defendants argue that Plaintiff cannot make out a prima facie case of FMLA retaliation let alone sustain the ultimate burden of showing that Defendants' reason is pretext. The Court does not agree.

To begin, based on the record before the Court, Plaintiff clearly meets the first two prongs of the prima facie case for FMLA retaliation in that: (1) she took FMLA leave; and (2) was terminated when she returned to work. In addition, the record reflects sufficient evidence that the adverse action was causally related to the leave; factors that support the third prong include: (1) the timing of Plaintiff's termination in that Plaintiff was fired the day she returned from leave, see Parker, 234 F. Supp. at 492 n. 15; see also Holpp v. Integrated Communications, Corp., 2005 WL 3479682, at *9 (D.N.J. 2005)("the Third Circuit has held that temporal proximity is suggestive of a causal connection for proving a prima facie case of retaliation"); (2) Plaintiff was the only employee terminated; (3) no documentation that the "restructuring" was planned prior to Plaintiff's leave; and (4) the inconsistent reasons given for Plaintiff's termination as set forth in Defendants' emails. For these reasons, Plaintiff has set forth a prima facie case of FMLA retaliation.

In response to Plaintiff's claim of retaliation, Defendants argue that Spagnoli would have been terminated regardless of her leave because the department was restructured. Thus, the Court must consider whether Defendants' reasons were a pretext for discrimination. Based on the evidence in the record, and, in particular, the draft termination letter as well as the "smoking gun" email that raises various inferences against the Defendants, the Court finds that Plaintiff has been able to raise an issue of fact regarding whether Defendants' explanation was pretextual. In

30

Parker, the court denied an employer's motion for summary judgment finding that Plaintiff has raised a fact issue regarding whether the employer's explanation was pretextual by presenting testimony that said "'basically, if we hadn't had her in that position, then we should just continue not having her rather than having her come back,' by showing that defendants created a position similar to plaintiff's position after she left, and by showing the close proximity of the job elimination to her leave." 234 F. Supp. 2d at 493. Similarly, in the instant matter, Plaintiff has raised an issue of fact by demonstrating: (1) the proximity of the alleged department reorganization to her absence from work; (2) that defendants propounded various explanations for why they were terminating her before deciding to terminate her based on the department reorganization; (3) issues of fact surrounding the legitimacy of the reorganization and specifically why Plaintiff was the only one terminated and why no one else seemed to know about the restructuring; and (4) an email that raises the inference that Defendants were not, in fact, planning on eliminating Plaintiff's position, Schaer Cert., ex. 39 (""I stressed how important it was that they have their ducks in a row as far as why her position was chosen as well as making sure they do NOT hire someone for a minimum of 6 months. They will not be transferring the person in from the Washington, NJ branch."). For all these reasons, Plaintiff has raised an issue of fact regarding Defendants' alleged legitimate reason for her termination that precludes a grant summary judgment.

iii. Individual Liability under the FMLA

Defendants additionally contend that Plaintiff's Complaint against individual Defendants, Moser and Roskey, should be dismissed. In the context of the FMLA, only individuals who

"exercise control" over the employee's FMLA leave can be held liable for an employer's FMLA violations. Kilvitis v. County of Luzerne, 52 F.Supp.2d 403, 412-413 (M.D.Pa.1999); see also Hewett v. Willingboro Board of Education, 421 F.Supp.2d 814, 817-818, n. 4 (D.N.J.2006) (individual employees in the public and private sectors can be liable for FMLA violations if they are acting on behalf of the employer).  The FMLA defines an "employer" as "any person who acts directly or indirectly in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)( 1 ). Thus, the plain language of the FMLA evinces an intent to provide for individual liability.

Here, Defendant argues that although Moser informed Plaintiff that her position was being terminated, Moser did not have any managerial authority over the Professional Lines department until January 1, 2005, and did not make the decisions regarding Plaintiff's FMLA leave or her termination.  In addition, Defendant argues that Roskey did not have any role in determining whether Plaintiff would be granted FMLA leave or in the reorganization of the Professional Lines Department.  The Court does not agree.

In the instant matter, the Court has found that issues of fact exist surrounding Plaintiff's FMLA leave including the individuals involved in making the decision and the reasons proffered for Plaintiff's termination.   Moreover, both Moser and Roskey appear to have been involved in the various email transactions, letters, and phone calls to and about Plaintiff and her termination.  Indeed, both Moser's and Roskey's names appear on numerous emails and other documents provided in the record.  For these reasons, the Court will not dismiss the claims for individual liability pursuant to the FMLA against Roskey and Moser.

3. **Intentional Infliction of Emotional Distress**

Plaintiff also asserts a claim for intentional infliction of emotional distress arising out of the events surrounding Plaintiff's termination.  New Jersey recognizes the tort of intentional infliction of emotional distress. In order to recover for such a claim, "the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Griffin v. Tops Appliance City, Inc., 337 N.J.Super. 15, 22 (N.J.Super.Ct. App.Div. 2001).  "Generally, it is rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery on a claim of intentional infliction of emotional distress." Harris v. Middlesex County College, 353 N.J.Super. 31, 46 (N.J.Super.Ct.App .Div.2002) (citations and internal quotations omitted).

Specifically, New Jersey courts have held that to establish a claim for intentional infliction of emotional distress, a plaintiff must initially "prove that the defendant acted intentionally or recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress. Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow. Second, the defendant's conduct must be extreme and outrageous. The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress. Fourth, the emotional distress suffered by the plaintiff must be 'so severe that no reasonable man could be expected to endure it.'" Griffin, 337 NJ Super. at 22-23 (citations omitted).

In the instant matter, Plaintiff has not set forth any facts to suggest that the Defendants

intended to produce emotional distress by terminating her, that the conduct was so extreme and outrageous that it was beyond bounds of decency, that Defendants' actions were the cause of Plaintiff's distress or that Plaintiff actually suffered from severe emotional distress.  For these reasons, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's claims of Intentional Infliction of Emotional Distress.


**IV. Conclusion**

For the reasons stated herein, this Court grants Defendants' Motion for Summary Judgment on Plaintiff's NJLAD claims and Plaintiff's claim for Intentional Infliction of Emotional Distress.  However, the Court denies Defendants' Motion for Summary Judgment on Plaintiff's FMLA claims.  An appropriate order will follow.


Dated: August 14, 2007                        /s/ Freda L. Wolfson
                                              The Honorable Freda L. Wolfson
                                              United States District Judge

34